UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JIM LIVINGSTON, BRIAN PULLING, DALE ROWE, CARL DREWS, and DAN O'CONNOR, <br><br> Cross-Claim Plaintiffs, <br><br> vs. <br><br> CAPTAIN ROBERT WACKER, CITY OF BRIDGETON, CHIEF WALTER MUTERT, MAJOR STEINMAN, and CAPTAIN DON HOOD, <br><br> Cross-Claim Defendants. | Case No. 4:06-CV-1574 (JCH) |

## MEMORANDUM AND ORDER

This matter is before the Court on Cross-Claim Defendants City of Bridgeton, Chief Walter Mutert ("Mutert"), Major Steinman ("Steinman"), Captain Don Hood ("Hood"), and Captain Robert Wacker's ("Wacker") (collectively "Cross-Defendants") Motion for Summary Judgment on Count I of Cross-Claim Plaintiffs' Third Amended Cross-Claim Complaint, filed July 3, 2007.[1] (Doc. No. 39). The matter is fully briefed and ready for decision.

## BACKGROUND

By way of background, this cause of action involves events occurring at the City of Bridgeton, Missouri, Police Department ("Police Department"). At all relevant times, Sergeant John Bartis ("Bartis") was the commanding officer of Cross-Claim Plaintiffs Jim Livingston ("Livingston"), Brian Pulling ("Pulling"), Dale Rowe ("Rowe"), Carl Drews ("Drews"), and Dan O'Connor

---

[1] In their Reply Memorandum, filed November 5, 2007, Cross-Defendants further request summary judgment on Count IV of Cross-Claim Plaintiffs' Third Amended Cross-Claim Complaint. (Doc. No. 70-1).

- 1 -

("O'Connor") (collectively "Cross-Plaintiffs"). (Cross-Claim Plaintiffs Rowe, O'Connor, Livingston, Drews, and Pulling's Joint Third Amended Cross-Claim Complaint ("Cross-Claim"), Doc. No. 23, ¶ 5). According to Cross-Plaintiffs, Bartis constantly harassed Livingston and Pulling, culminating in Bartis suspending Livingston. (Id., ¶ 6, 7). Cross-Plaintiffs maintain that, although the harassment and suspension were in retaliation for Cross-Plaintiffs' whistleblowing regarding Bartis' excessive use of force with prisoners[2], Cross-Defendants did nothing to discipline Bartis. (Id., ¶¶ 7, 9, 10).[3] Cross-Plaintiffs assert Cross-Defendants had a pattern and practice of ignoring such complaints against Bartis, and in fact went to great lengths to cover up Bartis' behavior. (Id., ¶ 12).

After Livingston was suspended, both he and O'Connor again complained to Cross-Defendants regarding Bartis' excessive use of force with prisoners. (Cross-Claim, ¶¶ 13, 14). Livingston further informed Cross-Defendants that if nothing were done about Bartis' misconduct, he would report his allegations to the FBI. (Id., ¶ 13). At that time, Cross-Defendants initiated an internal affairs investigation of Bartis, and took written statements from all Cross-Plaintiffs regarding Bartis' conduct. (Id., ¶¶ 15, 16).

According to Cross-Plaintiffs, Hood gave Bartis copies of their statements, which Bartis then disseminated to other officers on his shift. (Cross-Claim, ¶¶ 17, 18).[4] Cross-Plaintiffs assert that after the release of their statements, they were subjected to retaliatory and adverse employment actions by

---

[2] Cross-Plaintiffs maintain they reported Bartis' allegedly criminal misconduct, i.e., excessive use of force against prisoners, to both the command staff and the Federal Bureau of Investigation ("FBI"). (Cross-Claim, ¶¶ 10, 11).

[3] According to Cross-Plaintiffs, Cross-Defendants were responsible for supervising Bartis' actions, as they were all members of the command staff with the Police Department. (Cross-Claim, ¶ 8).

[4] During the course of the internal affairs investigation, Bartis was transferred from Platoon A, where Cross-Plaintiffs were assigned, to Platoon D. (See Bartis' Amended Petition, Doc. No. 1-3, ¶¶ 10, 11; Cross-Plaintiffs' Counterclaim against Bartis, Doc. No. 1-5, ¶ 12).

Cross-Defendants and others, including the denial of promotions, the failure to provide back up, and the refusal of overtime hours. (Id., ¶¶ 19, 23, 25-26).[5]

When Cross-Defendants failed adequately to address Bartis' criminal misconduct, Cross-Plaintiffs reported the behavior to the FBI. (Cross-Claim, ¶ 20).[6] According to Cross-Plaintiffs, the FBI then instigated an investigation, which culminated in an application for warrants to the St. Louis County Prosecuting Attorney's Office. (Id., ¶ 22). Cross-Plaintiffs maintain the FBI's investigation is ongoing, and resulted in the termination of the internal investigation being conducted by the City of Bridgeton. (Id.).

The escalating tensions climaxed on February 14, 2005, when Bartis confronted O'Connor about "rumors" O'Connor had spread about Bartis. (Cross-Claim, ¶¶ 33, 34, 37). Bartis ordered O'Connor to follow him into the basement. (Id., ¶ 38). According to Cross-Plaintiffs, as O'Connor opened the basement door, Bartis said, "So you're going to the Feds, huh?" (Id., ¶ 40). When O'Connor turned to face Bartis, Bartis allegedly punched O'Connor on the jaw line. (Id., ¶ 41).[7] The force of Bartis' punch knocked O'Connor to the ground, and Bartis continued his attack while O'Connor lay on the floor. (Id., ¶¶ 42-44). Throughout the attack, Bartis berated O'Connor for being a "motherfucking FBI snitch." (Id., ¶ 44). O'Connor eventually got Bartis in a headlock, thus

---

[5] Cross-Plaintiffs further allege they were shunned by their fellow officers and members of the command staff. (Cross-Claim, ¶ 19).

[6] Livingston claims he contacted the FBI in June, 2004, within several weeks of his written report to the Police Department. (See Cross-Claim Plaintiffs' Motion and Memorandum in Opposition to Cross-Claim Defendants' Motion for Summary Judgment ("Cross-Plaintiffs' Opp."), Doc. No. 67, PP. 5-6). Cross-Plaintiffs further maintain O'Connor approached the FBI on February 21, 2005, and Pulling, Drews and Rowe gave their statements to the FBI in April, 2005. (Id., P. 6).

[7] The Board of Police Commissioners for the City of Bridgeton found that Bartis was, "likely the aggressor" in the confrontation between Bartis and O'Connor. (Police Board's Findings of Fact and Conclusions, Doc. No. 23-2, P. 7).

allowing him to escape. (Id., ¶ 45). O'Connor contends he was severely injured in the attack. (Id., ¶ 47).[8]

On March 1, 2006, the Police Department terminated O'Connor's employment, allegedly for failing to return to work when his leave of absence expired. (Cross-Claim, ¶ 51). O'Connor believes his termination from his long time employment with the Police Department was in retaliation for his whistleblowing with respect to Bartis' excessive use of force against prisoners. (Id.).

On March 10, 2006, Bartis filed an Amended Petition in Missouri State court against Cross-Plaintiffs and Cross-Defendants City of Bridgeton, Mutert, Steinman and Hood (collectively "State Court Defendants"), for wrongful termination in violation of Missouri public policy (whistleblowing), slander, intentional interference with a business expectancy, and civil conspiracy. (Amended Petition, Doc. No. 1-3). Specifically, Bartis alleged that State Court Defendants claimed he abused prisoners in retaliation for his reporting their acts of misconduct. (Id.).

State Court Defendants moved to dismiss Bartis' cause of action. (State Court Defendants' Motion to Dismiss, Doc. No. 18-3). The State Court granted the motion, in an order stating in its entirety as follows: "Plaintiff Bartis' claims against all [State Court] Defendants are hereby dismissed with prejudice, with [State Court] Defendants' motions to dismiss hereby granted in their entirety." (Final Order, Doc. No. 1-7).

While still in State Court, Cross-Plaintiffs filed Cross-Claims against Wacker, the City of Bridgeton, Mutert, Steinman, and Hood. (Cross-Claims, Doc. No. 1-4). After Bartis' claims were dismissed in October, 2006, Cross-Defendants removed the case to this Court. (Notice of Removal, Doc. No. 1-1). Cross-Plaintiffs subsequently amended their Cross-Claims several times. Their Third

---

[8] Cross-Plaintiffs claim that several months after the altercation between Bartis and O'Connor, Drews discovered that Bartis was looking for Drews, in order to assault and batter him as well. (Cross-Claim, ¶ 48).

Amended Cross-Claim Complaint, filed February 26, 2007, alleged the following: (1) Retaliation for Exercising Their First Amendment Rights, in Violation of 42 U.S.C. § 1983 (Count I); (2) Violations of the Missouri Sunshine Act (Count II); (3) Violations of the Missouri Whistle Blower Protection Statute ("Whistle Blower Act"), as to O'Connor only (Count III); (4) Wrongful Discharge of O'Connor, in Violation of Public Policy (Count IV); and (5) Violations of the Whistle Blower Act as to Cross-Plaintiffs Generally (Count V). (Doc. No. 23). In an Order entered May 18, 2007, however, this Court dismissed Cross-Plaintiffs' Sunshine Act Cross-Claim as time-barred. (Doc. No. 36). The Court further dismissed Cross-Plaintiffs' two Whistle Blower Act Cross-Claims, because the officers of the Police Department are not state employees for purposes of that Act. (Id.).[9]

As stated above, Cross-Defendants filed the instant Motion for Summary Judgment on July 3, 2007. (Doc. No. 39).

**SUMMARY JUDGMENT STANDARD**

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

---

[9] The Court denied Cross-Defendants' Motion to Dismiss with respect to Count I. (Doc. No. 36). Cross-Defendants did not move for dismissal of Count IV of the Third Amended Cross-Claim Complaint.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

**I. Retaliation For Exercising Cross-Plaintiffs' First Amendment Rights, In Violation Of 42 U.S.C. § 1983**

"A First Amendment retaliation claim requires a plaintiff to prove the following three elements: (1) that the plaintiff engaged in protected First Amendment activity; (2) the government responded with retaliation; and (3) the protected activity was the cause of the government's retaliation." Skrutski v. Marut, 2006 WL 2660691 at *1 (M.D. Pa. Sept. 15, 2006) (citation omitted). With respect to the first element, the Eighth Circuit has held that, "[t]o decide whether a public employee's speech is protected by the First Amendment, a court must first determine 'whether the employee spoke as a citizen on a matter of public concern.'" McGee v. Public Water Supply, Dist. No. 2 of Jefferson County, Mo., 471 F.3d 918, 920 (8th Cir. 2006), quoting Garcetti v. Ceballos, 126 S.Ct. 1951, 1958 (2006). "If the answer to that question is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Bradley v. James, 479 F.3d 536, 538 (8th Cir. 2007); see also Garcetti, 126 S.Ct. at 1960 ("[W]hen public

- 6 -

employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). If the answer is yes, however, the possibility of a First Amendment claim arises. Bradley, 479 F.3d at 538 n. 2. The question next becomes, "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." McGee, 471 F.3d at 920 n. 2 (internal quotations and citations omitted).

> **A.** **In Reporting Bartis' Alleged Misconduct, Were Cross-Plaintiffs Speaking As Private Citizens, On A Matter Of Public Concern?**
>
> > **1.** **Are Cross-Plaintiffs Barred By Their Judicial Admissions From Asserting They Spoke As Citizens In Reporting Bartis' Alleged Misconduct?**

In their Motion for Summary Judgment, Cross-Defendants first assert Cross-Plaintiffs are barred by their earlier judicial admissions from asserting they spoke as private citizens in reporting Bartis' alleged misconduct. (Defendants' Memorandum in Support of their Motion for Summary Judgment on Count I of Plaintiffs' Third Amended Complaint, Doc. No. 40, PP. 2-6). As background for this argument, the Court notes that while this case was in Missouri State court, Cross-Defendants' counsel initially represented all the State Court Defendants, including Cross-Plaintiffs. Cross-Defendants' counsel filed a motion to dismiss Bartis' claims on behalf of all the State Court Defendants. (State Court Defendants' Motion to Dismiss Plaintiff's Petition, Doc. No. 18-3). While that motion was pending, Cross-Plaintiffs hired their own counsel, in order to bring Cross-Claims. Their new counsel adopted the previously filed motion to dismiss, however, which asserted that Bartis' defamation claim must be dismissed because the State Court Defendants' speech was absolutely privileged. (Doc. Nos. 18-3, 18-9). The motion stated in relevant part as follows:

> In this Action, Plaintiff (Bartis) alleges that police officers for the Bridgeton Police Department (the "Department") reported to their superiors that Plaintiff may have used excessive force against detainees, which accusations

> led to internal affairs and FBI investigations that are on-going. Plaintiff claims the accusations were false and has sued the officers, ranking officials in the Department and the Department itself for....defamation....
>
> Among other reasons set forth herein, Plaintiff's claims must be dismissed because:...2) the officers' reports of police misconduct by Plaintiff are absolutely privileged;....
>
> Reports by police officers to their superiors and to the FBI of unlawful conduct by a fellow police officer, which reports resulted in an on going internal affairs investigation and an FBI investigation, are entitled to absolute privilege....
>
> Rule 6.04 of the police department's rules and regulations requires police officers to "report any criminal conduct or violation of any rule, regulation, or order by other members." *See* Rule 6.04(J), Ex. A. Rule 6.03(u) of the police department's rules and regulations prohibits the use of excessive force. *See* Rule 6.03(u), Ex. A. Here, pursuant to their duty to the public and pursuant to the police department's rules and regulations, the Defendant officers reported what they suspected was unlawful conduct in the form of excessive force against detainees to their superiors, which reports led to an internal affairs and FBI investigation. ... If police officers who are sworn "To Protect and Serve" and required to report criminal conduct by fellow officers are subject to defend against lawsuits for making those required reports, those officers will be discouraged from reporting other police misconduct at all. Consequently, the administration of justice will suffer....
>
> In the instant case, Plaintiff bases his defamation claim against the Department and fellow officers on allegedly false reports by those officers to their superiors and the FBI. The officers' statements, however, initiated and/or were made in connection with both an internal affairs investigation and FBI investigation of Plaintiff's potentially criminal conduct. As such, these reports, which Defendants had a duty to make and/or investigate, are protected by an absolute privilege. As such, Defendants are absolutely immune from civil action regardless of intent. Accordingly, Plaintiff's defamation claim must be dismissed.

(Doc. No. 18-3, PP. 1-2, 8-10).

As stated above, Cross-Defendants maintain the above assertions constitute judicial admissions, sufficient to bar Cross-Plaintiffs' current position regarding whether they spoke in their capacities as private citizens. Under Eighth Circuit law, "[s]tatements contained in a party's pleadings are binding on that party, and are considered judicial admissions, unless the statements are withdrawn

- 8 -

or amended." In re Crawford, 274 B.R. 798, 804-05 (8th Cir. BAP 2002) (citations omitted). This Court has elaborated on the doctrine of judicial admissions as follows:

> It is elementary that the doctrine of judicial admissions (when otherwise warranted) pertains only to matters of *fact* which otherwise would require *evidentiary* proof. As held in *State Farm Mutual Auto Ins. Co. v. Worthington*, 8 Cir. 1968, 405 F.2d 683, "The purpose of a judicial admission is that it acts as a *substitute for evidence* in that it does away with the need for *evidence* in regard to the subject matter of the judicial admission."
>
> Moreover, as Judge Haynsworth well stated in *New Amsterdam Casualty Company v. Waller*, 4 Cir. 1963, 323 F.2d 20, 24-25: "The doctrine of judicial admissions has never been applied to counsel's statement of his conception of the *legal theory* of the case. When counsel speaks of legal principles, as he conceives them and which he thinks applicable, he makes no judicial admission and he sets up no estoppel which would prevent the court from applying to the facts disclosed by the proof the proper legal principles as the Court understands them."

Clark v. Mobil Oil Corp., 1980 WL 2002 at *3 (E.D. Mo. Sept. 5, 1980) (emphasis in original). See also Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC, 477 F.3d 383, 394 (6th Cir. 2007) (internal quotations and citation omitted) ("[W]e reiterated that we are reluctant to treat [statements dealing with opinions and legal conclusions] as binding judicial admissions."); U.S., ex rel. Miller v. Bill Harbert Intern. Const., Inc., 2007 WL 851871 at *1 (D.D.C. Mar. 14, 2007) (same).

Upon consideration, the Court finds the assertions contained in Cross-Plaintiffs' State Court Motion to Dismiss dealt with legal conclusions, and not matters of fact, and thus cannot constitute binding judicial admissions. See Roger Miller, 477 F.3d at 394. Specifically, the Court notes Cross-Plaintiffs' earlier arguments addressed their former attorney's interpretation of both Police Department regulations and the law, on such issues as whether Cross-Plaintiffs had a duty to report Bartis' alleged misconduct to their superiors and/or the FBI, and whether their reporting was privileged. These matters do not concern unequivocal statements regarding matters of fact, subject to the production of evidentiary proof at trial. Id. Cross-Defendants' Motion for Summary Judgment

on the basis that Cross-Plaintiffs are barred by judicial admissions from claiming they spoke as private citizens must therefore be denied.[10]

### 2. Were Cross-Plaintiffs Speaking As Private Citizens Or Public Employees When They Reported Bartis' Alleged Misconduct?

In Count I of their Cross-Claim, Cross-Plaintiffs claim Cross-Defendants retaliated against them for exercising their First Amendment rights, in violation of 42 U.S.C. § 1983. (Cross-Claim, ¶¶ 68-79). As stated above, Cross-Defendants assert Cross-Plaintiffs' § 1983 claim fails, because their speech was not protected by the First Amendment. Thus, this Court must determine whether Cross-Plaintiffs' speech was made pursuant to their official duties. See Morales v. Jones, 494 F.3d 590, 596 (7th Cir. 2007), cert. denied, 2008 WL 59371 (2008).

"Because both parties in *Garcetti* agreed that Ceballos' speech was made pursuant to his official duties, the [Supreme] Court 'had no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate.'" Morales, 494 F.3d at 596, quoting Garcetti, 126 S.Ct. at 1961. Lower courts attempting to apply Garcetti have followed the Supreme Court's general guidance that, "the proper inquiry is a practical one," and should focus on, "the duties an employee actually is expected to perform." Garcetti, 126 S.Ct. at 1961, 1962.

#### a. Cross-Plaintiffs' Statements To Their Superiors

In June and July, 2004, Cross-Plaintiffs provided their command staff with written statements regarding Bartis' excessive use of force with prisoners. (Cross-Plaintiffs' Opp., P. 3 and attached

---

[10] In any event, the Court notes that even if Cross-Plaintiffs' statements were held to be judicial admissions, "it is also well-established that trial judges are given broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases." Electric Mobility Corp. v. Bourns Sensors/Controls, Inc., 87 F.Supp.2d 394, 406 (D.N.J. 2000) (citations omitted).

Exhs. 23-28). At that time, Cross-Defendants initiated an internal affairs investigation of Bartis, and assigned the investigation to Hood and Wacker. (Id.).

Upon consideration of the record, the Court finds Cross-Plaintiffs were not speaking as private citizens for First Amendment purposes when they made their statements to their superiors, for several reasons. See Garcetti, 126 S.Ct. at 1960. First, the Court notes that Rule 6.04(J) of the Police Department's rules and regulations requires police officers to, "report any criminal conduct or any violation of any rule, regulation, or order by other members." (Police Department Rule 6, Doc. No. 67-12, P. 6). Thus, Livingston's and O'Connor's initial reports regarding Bartis' alleged misconduct were required pursuant to Police Department policy. Further, each Cross-Plaintiff has admitted his written report was submitted pursuant to orders from his superiors. See, e.g., Livingston Dep., Doc. No. 70-5, PP. 73, 96-97, 101-02; Livingston Statement, Doc. No. 70-8; Drews Dep., Doc. No. 70-9, PP. 58-61; Drews' Statement, Doc. No. 70-13; Pulling Dep., Doc. No. 70-14, PP. 41-43; Doc. No. 70-15, PP. 125, 152-54; O'Connor Dep., Doc. No. 70-16, PP. 101-03, 116; Doc. No. 70-17, P. 117; Rowe Dep., Doc. No. 70-18, PP. 92, 105-06. Thus, as police officers, Cross-Plaintiffs had duties both to report instances of officer misconduct, and to cooperate with the investigation Hood and Wacker were conducting into Bartis' alleged actions. See Bradley, 479 F.3d at 538. See also Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006), cert. denied, 127 S.Ct. 1918 (2007) (internal reports of prisoner and prison officials' misconduct were submitted pursuant to plaintiff's official duties as a correctional officer, and thus were not constitutionally protected); Battle v. Board of Regents for Georgia, 468 F.3d 755, 761 (11th Cir. 2006). The Court thus holds the statements Cross-Plaintiffs provided to their superiors within the Police Department were made pursuant to their official duties, and thus are not entitled to protection under the First Amendment.

**b.      Statements To The FBI**

In their Motion for Summary Judgment, Cross-Defendants next assert Cross-Plaintiffs' statements to the FBI similarly are not protected by the First Amendment, because they too were made pursuant to Cross-Plaintiffs' official duties as police officers. (Defendants' Reply Memorandum in Support of their Motion for Summary Judgment ("Cross-Defendants' Reply"), PP. 3-7). With respect to Livingston and O'Connor, the Court finds a genuine issue of material fact remains on this issue. Specifically, the Court notes that the Police Department's regulations did not require Livingston and O'Connor to report Bartis' alleged misconduct to the FBI; rather, the Department's written policy actually prohibited officers from, "mak[ing] known to any person not a member of the Police Department any information whatsoever concerning matters learned by them in the course of their duty as members of the Department or obtained by them by virtue of their connection with the Department, without the express permission of the Chief of Police;...." (Police Department Rule 6.03(d), Doc. No. 67-12, P. 4). Further, O'Connor testified that as a practical matter, his job duties did not involve reporting other officers' alleged acts of misconduct to outside agencies; rather, O'Connor claims no other officer had done so during his twenty-two years with the Department. (O'Connor Dep., Doc. No. 75-8, P. 3). In light of these assertions, the Court finds a genuine issue of material fact remains with respect to whether Cross-Plaintiffs Livingston and O'Connor were acting as private citizens, rather than public employees, when they made their complaints to the FBI. See, e.g., Batt v. City of Oakland, 2006 WL 1980401 at *4 (N.D. Cal. Jul. 13, 2006) ("Here, defendants' argument that plaintiff had a duty to report misconduct rests on [Oakland Police Department] rules and regulations-materials which the *Garcetti* Court suggested are not dispositive. The central premise of plaintiff's case is that not withstanding any official policy of the OPD, the culture of the OPD and the express commands of his direct supervisors established that plaintiff had a duty *not* to report misconduct....Thus, a fact issue remains as to whether plaintiff's speech was

protected under the First Amendment."); see also Freitag, 468 F.3d at 545 (correctional officer acted as a citizen when she wrote letters to a Senator and communicated with the Inspector General regarding her complaints of sexual harassment at the prison).

With respect to Cross-Plaintiffs Pulling, Rowe, and Drews, however, the Court finds their statements to the FBI were made pursuant to their official duties as police officers. The Court's review of the record reveals that on February 23, 2005, Major Steinman issued a memorandum, stating in relevant part as follows[11]:

> We have learned of an investigation of this Department involving the FBI. We have also learned that the FBI may contact and seek to interview all Department personnel in the course of this investigation.
>
> The City of Bridgeton and the Bridgeton Police Department are committed to cooperating in all aspects of this investigation....
>
> As such, any Department personnel who are contacted in connection with the investigation should politely advise the investigators that the Department is represented by counsel and that counsel will work with investigators to arrange times to interview Department personnel.
>
> Any Department personnel who are contacted must then notify their commander of the contact in order that arrangements may be made to cooperate with investigators.

(Memorandum, Doc. No. 70-22). Cross-Plaintiffs Pulling, Rowe, and Drews all met with FBI personnel in April, 2005, after Major Steinman issued his memorandum directing their cooperation with the agency. (Cross-Plaintiffs' Opp., P. 6). Furthermore, Cross-Plaintiff Pulling testified at his deposition that he was paid overtime by the Police Department for his interview with the FBI, and that he requested the overtime pay because he felt the interview with the FBI was, "department related," as it stemmed from an internal investigation. (Pulling Dep., Doc. No. 70-15, PP. 156-159, 163). Cross-Plaintiff Rowe acknowledged that he was paid by the City while he researched for his

---

[11] The memorandum was read to officers during roll call.

interview with the FBI. (Rowe Dep., Doc. No. 70-18, PP. 96-99). Finally, Cross-Plaintiff Drews testified that Major Steinman directed him to cooperate with the FBI, and to coordinate the timing of his interview with his supervisor. (Drews Dep., Doc. No. 70-11, PP. 136-138).[12] In light of these admissions, the Court finds Cross-Plaintiffs Pulling, Rowe, and Drews conducted their interviews with the FBI pursuant to their official duties as police officers, and thus the statements they gave are not entitled to protection under the First Amendment. See Garcetti, 126 S.Ct. at 1960. Count I of Cross-Plaintiffs' Cross-Claim as it relates to these three officers will therefore be dismissed.

### 3. In Reporting Bartis' Alleged Misconduct, Were Livingston And O'Connor Speaking On A Matter Of Public Concern?

Cross-Defendants next assert Livingston and O'Connor cannot establish the first element of their claim for First Amendment retaliation, because they fail to demonstrate their complaints were on a matter of public concern. (Cross-Defendants' Reply, PP. 9-14). Cross-Defendants support this assertion with a number of examples allegedly demonstrating Livingston and O'Connor made their complaints out of self-interest, rather than out of concern for the public good. (Id.). While Cross-Defendants are free to present evidence on this point at trial, on the record before it the Court cannot hold as a matter of law that Livingston and O'Connor were not speaking on a matter of public concern, i.e., police brutality. Cross-Defendants' Motion for Summary Judgment on this point must therefore be denied.

### B. Were Livingston And O'Connor Subject To Retaliation In Response To Their Complaints About Bartis?

#### 1. Were Livingston And O'Connor's Complaints To The FBI A Motivating Factor For Cross-Defendants' Alleged Retaliation?

---

[12] Drews even requested to attend his deposition in connection with the instant case on duty time, as, "this is an issue which arose from a Departmental Investigation which I had been ordered to participate in,..." (Drews' September 5, 2007, Interoffice Memorandum to Chief Mutert, Doc. No. 70-24).

Cross-Defendants next assert that even if Livingston and O'Connor's complaints to the FBI were protected under the First Amendment, the two men cannot show they were retaliated against because of them. Specifically, Cross-Defendants note Livingston and O'Connor admit the alleged retaliation began immediately after they made their unprotected internal complaints about Bartis, and that O'Connor did not even speak with the FBI for another 8 months. (Cross-Defendants' Reply, P. 14). Cross-Defendants thus maintain Livingston and O'Connor cannot demonstrate they were treated differently *because of* their communications with the FBI. (Id.).

Upon consideration, the Court will deny this portion of Cross-Defendants' motion, for two reasons. First, as to Livingston, the Court's review of the record reveals a genuine issue of material fact remains with respect to both the timing of his initial contact with the FBI, and the point at which Cross-Defendants became aware of such contact. Second, the Court recognizes both remaining Cross-Plaintiffs' right to present evidence that all retaliatory acts taking place subsequent to their talks with the FBI were a direct result of their complaints to that agency.[13] Point denied.

### 2. Are Cross-Defendants Liable For The Alleged Retaliation?

#### a. Retaliation By Fellow Officers

Under Eighth Circuit law, it is well settled that the doctrine of respondeat superior is inapplicable to § 1983 claims. Vaughn v. Greene County, Ark., 438 F.3d 845, 851 (8th Cir. 2006). Rather, "supervisors in this position are liable under § 1983 for a subordinate's violation of a third person's constitutional right only if their deliberate indifference to the offensive conduct and failure to take adequate remedial action proximately caused the injury." Cox v. Sugg, 484 F.3d 1062, 1066 (8th Cir. 2007) (citations omitted).

---

[13] In his response to Cross-Defendants' Motion for Summary Judgment, O'Connor admits he approached the FBI on February 21, 2005, *after* he was assaulted by Bartis. (Cross-Plaintiffs' Opp., P. 6). The assault thus was not in retaliation for speech protected by the First Amendment.

In their Cross-Claim, Livingston and O'Connor assert Cross-Defendants had a pattern and practice of failing to discipline Bartis for his excessive use of force with prisoners. (See, e.g., Cross-Claim, ¶¶ 11, 12, 28). They maintain such failure prompted their complaints to the FBI, which in turn led to retaliatory acts by Bartis and other officers. (Plaintiffs' Response Memorandum in Opposition to Defendants' Motion for Summary Judgment, Doc. No. 75, PP. 15-16). Livingston and O'Connor further allege Cross-Defendants were aware of the retaliation against them, but followed their established policy of allowing it to continue. (Cross-Claim, ¶¶ 24, 27, 50). Upon consideration of the foregoing, the Court finds a genuine issue of material fact remains with respect to whether Cross-Defendants' alleged deliberate indifference to Bartis' offensive conduct, and consequent failure to take adequate remedial action, proximately caused injury to Livingston and O'Connor. Cox, 484 F.3d at 1066. Cross-Defendants' Motion for Summary Judgment on this point will therefore be denied.[14]

### b. Retaliation By Cross-Defendants Themselves

Cross-Defendants finally assert Livingston and O'Connor have failed to demonstrate actions taken by Cross-Defendants themselves were in response to the complaints to the FBI. (Cross-Defendants' Reply, PP. 17-18). Rather, Cross-Defendants maintain each of the allegedly adverse employment actions was undertaken for legitimate reasons. (Id.). While the question is a close one, the Court's review of the record reveals fact questions remain, both with respect to whether several of Cross-Defendants' acts constituted adverse employment actions in the first instance, and whether Cross-Defendants' actions were motivated by Livingston and O'Connor's reports to the FBI. Cross-Defendants' Motion for Summary Judgment on this point must therefore be denied.

---

[14] The Court reiterates Cross-Defendants may only be held liable for acts of retaliation occurring after Livingston and O'Connor reported Bartis' misconduct to the FBI.

## II. Wrongful Discharge of O'Connor, in Violation of Public Policy

In Count IV of his Cross-Claim, Cross-Plaintiff O'Connor alleges he was terminated from his position with the Police Department in direct retaliation for his reporting acts of criminal misconduct on the part of Bartis to Cross-Defendants and the FBI. (Cross-Claim, ¶ 99). O'Connor thus maintains his termination was in violation of Missouri public policy. (Id., ¶ 100).

Under Missouri law, "a narrow, public policy exception has been carved out for wrongful discharge for an at-will employee..." Lynch v. Blanke Baer & Bowey Krimko, Inc., 901 S.W.2d 147, 150 (Mo. App. 1995) (citation omitted). Missouri courts have outlined four categories of public policy exception cases: "(1) discharge of an employee because of his or her refusal to perform an illegal act; (2) discharge because an employee reported violations of law or public policy to superiors or public authorities; (3) discharge because an employee participated in acts that public policy would encourage, such as jury duty, seeking public office, asserting a right to collective bargaining, or joining a union; and (4) discharge because an employee filed a worker's compensation claim." Bell v. Dynamite Foods, 969 S.W.2d 847, 852 (Mo. App. 1998) (citation omitted); see also O'Neill v. Major Brands, Inc., 2006 WL 1134476 at *2 (E.D. Mo. Apr. 26, 2006).

O'Connor's claim involves the second public policy exception, i.e., wrongful discharge because he reported violations of law or public policy to superiors and public authorities. "To prevail on such a claim, [O'Connor] must prove that: (1) he reported to superiors or to public authorities serious misconduct that constitutes a violation of the law and of well-established and clearly mandated public policy; (2) [Cross-Defendants] discharged him; and (3) there was an exclusive causal connection between his discharge and reporting violations to either his superiors or to public authorities." Bell, 969 S.W.2d at 852 (citation omitted).

Upon consideration, the Court finds O'Connor's reports to his superiors and the FBI undoubtedly concerned allegations of "serious misconduct," i.e., policy brutality. Further, there is no dispute that Cross-Defendants terminated O'Connor's employment. The question for the Court thus becomes whether O'Connor can show an exclusive causal connection between the discharge and his reports to Cross-Defendants and the FBI regarding Bartis.

Upon consideration, the Court finds O'Connor cannot establish this element of his *prima facie* case of wrongful termination. Specifically, the Court notes that O'Connor maintains he first complained to Mutert and Steinman regarding Bartis' misconduct in the summer of 2003. (O'Connor Dep., Doc. No. 70-16, PP. 95-96). He then was interviewed for Hood and Wacker's investigation in June, 2004. (Id., PP. 93-94). Finally, O'Connor approached the FBI with his allegations on February 21, 2005. (See Doc. No. 70-23). O'Connor's employment was not terminated until March 1, 2006, however, nearly three years after he made his first complaint. (Cross-Claim, ¶ 51). The Court finds such a time span too great to create an inference of the causal connection necessary to support O'Connor's claim. See, e.g., Hickman v. May Dept. Stores Co., 887 S.W.2d 628, 631 (Mo. App. 1994). Cross-Defendants' Motion for Summary Judgment on Count IV of Cross-Plaintiffs' Cross-Claim will therefore be granted.[15]

## CONCLUSION

Accordingly,

---

[15] As further support for its ruling, the Court notes that even if O'Connor could establish a *prima facie* case of wrongful discharge in violation of public policy, his claim fails because he cannot demonstrate Cross-Defendants' reason for the discharge was pretextual. Specifically, the Court notes that while O'Connor affirmatively asserts all five Cross-Plaintiffs complained both to their superiors and to the FBI regarding Bartis, only O'Connor was subject to termination. This fact weighs heavily against a finding that Cross-Defendants terminated O'Connor's employment solely in retaliation for his reports of misconduct on the part of Bartis.

**IT IS HEREBY ORDERED** that Cross-Defendants' Motion for Summary Judgment (Doc. No. 39) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.

**IT IS FURTHER ORDERED** that Count IV of Cross-Plaintiffs' Cross-Claim is **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that Brian Pulling, Dale Rowe, and Carl Drews are **DISMISSED** as Cross-Plaintiffs in this matter.

Dated this 18th day of January, 2008.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE