UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JIM LIVINGSTON, BRIAN PULLING, DALE ROWE, CARL DREWS, and DAN O'CONNOR, | ) ) ) ) |
| Counter-Claim Plaintiffs, | ) ) |
| vs. | ) ) Case No. 4:06-CV-1574 (JCH) |
| JOHN J. BARTIS, | ) ) ) |
| Counter-Claim Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Counter-Claim Defendant John J. Bartis' Motion for Summary Judgment or in the Alternative Motion to Dismiss Counter-Claims against Defendant John Bartis ("Motion for Summary Judgment"), filed November 14, 2007. (Doc. No. 72). The matter is fully briefed and ready for decision.

**BACKGROUND**

By way of background, this cause of action involves events occurring at the City of Bridgeton, Missouri, Police Department ("Police Department"). At all relevant times, Sergeant John Bartis ("Bartis") was the commanding officer of Counter-Claim Plaintiffs Jim Livingston ("Livingston"), Brian Pulling ("Pulling"), Dale Rowe ("Rowe"), Carl Drews ("Drews"), and Dan O'Connor ("O'Connor") (collectively "Counter-Plaintiffs"). (Counterclaim of Defendants O'Connor, Pulling, Livingston, Rowe, and Drews against Bartis, in his Individual and Official Capacity ("Counterclaim"), Doc. No. 1-5, ¶ 2). According to Counter-Plaintiffs, in early 2004, Livingston witnessed Bartis strike a handcuffed prisoner without provocation. (Id., ¶ 4). Although Livingston

informed his supervisors of the alleged misconduct, they took no action with respect to Bartis. (Id., ¶ 5).[1]

In June, 2004, Livingston again informed the Police Department that Bartis was abusing prisoners, and using excessive force against them. (Counterclaim, ¶ 7). At that time, Captains Don Hood ("Hood") and Robert Wacker ("Wacker") asked Livingston to submit a report regarding the alleged use of excessive force. (Id., ¶ 8). On June 29, 2004, O'Connor also submitted a written complaint regarding Bartis' actions. (Id., ¶ 9).

After receiving the statements from Livingston and O'Connor, the City of Bridgeton initiated an internal affairs investigation of Bartis. (Counterclaim, ¶ 10). Counter-Plaintiffs all participated in the investigation, by providing the Police Department with written statements regarding their knowledge of Bartis' excessive use of force on prisoners. (Id., ¶ 11). In September, 2004, Hood and Wacker gave Bartis copies of these statements, which Bartis then disseminated to other officers on his shift. (Id., ¶¶ 13, 14).[2] Counter-Plaintiffs assert that after the release of their statements, they were subjected to retaliatory and adverse employment actions by Bartis and others[3], including the denial of promotions, the failure to provide back up, and the refusal of overtime hours. (Id., ¶¶ 16, 17).[4]

---

[1] Counter-Plaintiffs allege the City of Bridgeton had a pattern and practice of ignoring such complaints against Bartis. (Counterclaim, ¶ 6).

[2] During the course of the internal affairs investigation, Bartis was transferred from Platoon A, where Counter-Plaintiffs were assigned, to Platoon D. (See Bartis' Amended Petition, Doc. No. 1-3, ¶¶ 10, 11; Counterclaim, ¶ 12).

[3] According to Counter-Plaintiffs, Bartis was responsible for supervising the actions and conduct of his subordinate officers. (Counterclaim, ¶ 18).

[4] Counter-Plaintiffs further allege they were shunned by their fellow officers and members of the command staff. (Counterclaim, ¶¶ 15, 16).

The escalating tensions climaxed on February 14, 2005, when Bartis confronted O'Connor about "rumors" O'Connor had spread about Bartis. (Counterclaim, ¶ 20). Bartis ordered O'Connor to follow him into the basement. (Id., ¶ 21). According to Counter-Plaintiffs, as O'Connor opened the basement door, Bartis said, "So you're going to the Feds, huh?" (Id., ¶ 22). When O'Connor turned to face Bartis, Bartis allegedly punched O'Connor on the jaw line. (Id., ¶ 23).[5] The force of Bartis' punch knocked O'Connor to the ground, and Bartis continued his attack while O'Connor lay on the floor. (Id., ¶¶ 24-26). Throughout the attack, Bartis berated O'Connor for being a "motherfucking FBI snitch." (Id., ¶ 26). O'Connor eventually got Bartis in a headlock, thus allowing him to escape. (Id., ¶ 27). O'Connor contends he was severely injured in the attack. (Id., ¶ 30).[6]

In July, 2005, the Police Department terminated Bartis' employment for, among other things, assaulting a fellow officer. (Counterclaim, ¶ 31; see also Police Board Findings of Fact and Conclusions). On March 1, 2006, O'Connor also was terminated, allegedly for failing to return to work when his leave of absence expired. (Counterclaim, ¶ 30). O'Connor believes his termination from his long time employment with the Police Department was in retaliation for his whistleblowing with respect to Bartis' excessive use of force against prisoners. (Id.).

On March 10, 2006, Bartis filed an Amended Petition in Missouri State court against Counter-Plaintiffs and others[7] (collectively "State Court Defendants"), for wrongful termination in violation

---

[5] The Board of Police Commissioners for the City of Bridgeton found that Bartis was, "likely the aggressor" in the confrontation between Bartis and O'Connor. (Police Board's Findings of Fact and Conclusions, Doc. No. 23-2, P. 7).

[6] Counter-Plaintiffs claim that several months after the altercation between Bartis and O'Connor, Drews discovered that Bartis was looking for Drews, in order to assault and batter him as well. (Counterclaim, ¶ 29).

[7] Bartis also named the City of Bridgeton, the Bridgeton Board of Police Commissioners, Chief Walter H. Mutert, Major Steinman, and Captain Hood in his State Court Amended Petition. (Amended Petition, Doc. No. 1-3). Bartis did not include Captain Wacker as a Defendant in his suit. (Id.).

- 3 -

of Missouri public policy (whistleblowing), slander, intentional interference with a business expectancy, and civil conspiracy. (Amended Petition, Doc. No. 1-3). Specifically, Bartis alleged that State Court Defendants claimed he abused prisoners in retaliation for his reporting their acts of misconduct. (Id.).

State Court Defendants moved to dismiss Bartis' cause of action. (State Court Defendants' Motion to Dismiss, Doc. No. 18-3). The State Court granted the motion, in an order stating in its entirety as follows: "Plaintiff Bartis' claims against all [State Court] Defendants are hereby dismissed with prejudice, with [State Court] Defendants' motions to dismiss hereby granted in their entirety." (Final Order, Doc. No. 1-7).

While still in State Court, Counter-Plaintiffs filed the instant Counterclaim, alleging the following against Counter-Defendant Bartis: (1) Assault and Battery (Count I); (2) Retaliation for Exercising Their First Amendment Rights, in violation of 42 U.S.C. § 1983 (Count II); and (3) Violations of the Missouri Sunshine Act (Count III). (Doc. No. 1-5). After Bartis' claims were dismissed in October, 2006, the case was removed to this Court. (Notice of Removal, Doc. No. 1-1).

As stated above, Bartis filed the instant Motion for Summary Judgment on November 14, 2007. (Doc. No. 72). In his motion, Bartis alleges Count I of Counter-Plaintiffs' Counterclaim must be dismissed because, "[a] thorough investigation by the [Police] Department revealed no evidence that Bartis had committed the crime of assault and battery, and no criminal charges were filed against John Bartis pursuant to that incident." (Memorandum in Support of Bartis' Motion for Summary Judgment ("Bartis' Memo in Support"), P. 6). Bartis further alleges Count II must be dismissed, because Counter-Plaintiffs fail to allege Bartis personally engaged in retaliatory actions against them, and because they fail to demonstrate that at the time of their statements, they were speaking in their capacity as private citizens, rather than public employees. (Id., PP. 7-9). Finally, Bartis alleges Count

III must be dismissed, because this Court previously has held any claim of violation of the Missouri Sunshine Act is time-barred. (Id., P. 9-10).[8]

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

---

[8] Counter-Plaintiffs do not dispute Bartis' allegation with respect to Count III, and so his Motion for Summary Judgment on that Count will be granted.

## DISCUSSION

**I.     Assault And Battery**

Count I of Counter-Plaintiffs' Counterclaim states in relevant part as follows:

33.   At all times relevant hereto, any contact initiated by Counter-Defendant Bartis against Counter-Plaintiff O'Connor was unwanted.

34.   That Counter-Defendant Bartis, Counter-Plaintiff's superior Staff Sergeant, did brutally attack and beat Counter-Plaintiff O'Connor without provocation.

35.   That Counter-Defendant Bartis' actions were willful, wanton, and without legal justification, and done without Counter-Plaintiff's consent.

36.   As a direct and proximate result of Counter-Defendant's unlawful and intentional contact with Counter-Plaintiff O'Connor, Counter-Plaintiff O'Connor has been made to suffer back pain, numbness in his feet, leg spasms, elbow and wrist pain, loss of appetite, difficulty falling and staying asleep, neck pain, concussion, and adverse psychological effects, including emotional distress.

37.   As a further direct and proximate result of Counter-Defendant's actions, Counter-Plaintiff O'Connor has been made to suffer an extended leave of absence from his employment with Defendant Bridgeton Police Department, without pay, which leave of absence culminated in his termination from his employment.

38.   Counter-Plaintiff O'Connor has also incurred and continues to incur medical and therapy related expenses as well as lost wages.

(Counterclaim, ¶¶ 33-38). In his Motion for Summary Judgment, Bartis first asserts that because no claims are asserted in Count I by Counter-Plaintiffs Livingston, Pulling, Rowe, or Drews, he is entitled to have Count I dismissed against him as to those Counter-Plaintiffs. (Bartis' Memo in Support, P. 6). Counter-Plaintiffs do not dispute this assertion, and so those portions of Count I relating to all Counter-Plaintiffs other than O'Connor will be dismissed.

With respect to Counter-Plaintiff O'Connor, Bartis asserts as follows:

Counter-Defendant Bartis challenged Counter-Plaintiff O'Connor for spreading untrue rumors and making false reports about him. An altercation over the situation ensued between the two officers in the basement of the station. Counter-

> Plaintiff O'Connor threw the first punch and a fist fight ensued. Both men sustained injuries in the scuffle. A thorough investigation by the Department revealed no evidence that Bartis had committed the crime of assault and battery, and no criminal charges were filed against John Bartis pursuant to that incident. Counter-Defendant should be dismissed from Counter-Plaintiff O'Connor's allegations of assault and battery.

(Bartis' Memo in Support, P. 6). By way of response, O'Connor provides evidence that Bartis not only utilized physical force against O'Connor, but also was the instigator of the altercation between the two men. (Counter-Claim Plaintiffs' Memorandum in Opposition to Counter-Claim Defendant's Motion for Summary Judgment ("Counter-Plaintiffs' Opp."), P. 2; see also Police Board's Findings of Fact and Conclusions, PP. 5-7).

Upon consideration of the foregoing, the Court finds a genuine issue of material fact remains with respect to whether Bartis committed the torts of assault and battery against Counter-Plaintiff O'Connor. Bartis' Motion for Summary Judgment on this portion of Count I will therefore be denied.

## II. Retaliation For Exercising Counter-Plaintiffs' First Amendment Rights, In Violation Of 42 U.S.C. § 1983

"A First Amendment retaliation claim requires a plaintiff to prove the following three elements: (1) that the plaintiff engaged in protected First Amendment activity; (2) the government responded with retaliation; and (3) the protected activity was the cause of the government's retaliation." Skrutski v. Marut, 2006 WL 2660691 at *1 (M.D. Pa. Sept. 15, 2006) (citation omitted). With respect to the first element, the Eighth Circuit has held that, "[t]o decide whether a public employee's speech is protected by the First Amendment, a court must first determine 'whether the employee spoke as a citizen on a matter of public concern.'" McGee v. Public Water Supply, Dist. No. 2 of Jefferson County, Mo., 471 F.3d 918, 920 (8th Cir. 2006), quoting Garcetti v. Ceballos, 126 S.Ct. 1951, 1958 (2006). "If the answer to that question is no, the employee has no

First Amendment cause of action based on his or her employer's reaction to the speech." <u>Bradley v. James</u>, 479 F.3d 536, 538 (8th Cir. 2007); <u>see also</u> <u>Garcetti</u>, 126 S.Ct. at 1960 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). If the answer is yes, however, the possibility of a First Amendment claim arises. <u>Bradley</u>, 479 F.3d at 538 n. 2. The question next becomes, "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." <u>McGee</u>, 471 F.3d at 920 n. 2 (internal quotations and citations omitted).

### A. In Reporting Bartis' Alleged Misconduct, Were Counter-Plaintiffs Speaking As Private Citizens?

#### 1. Are Counter-Plaintiffs Barred By Their Judicial Admissions From Asserting They Spoke As Citizens In Reporting Bartis' Alleged Misconduct?

In his Motion for Summary Judgment, Bartis asserts Counter-Plaintiffs are barred by their earlier judicial admissions from asserting they spoke as private citizens in reporting Bartis' alleged misconduct. (Reply to Counter-Plaintiffs' Memorandum in Opposition to Counter-Claim Defendant's Motion for Summary Judgment, P. 4). As background for this argument, the Court notes that while this case was in Missouri State Court, one attorney initially represented all the State Court Defendants, including Counter-Plaintiffs. That attorney filed a motion to dismiss Bartis' claims on behalf of all the State Court Defendants. (State Court Defendants' Motion to Dismiss Plaintiff's Petition, Doc. No. 18-3). While that motion was pending, Counter-Plaintiffs hired their own counsel, in order to bring Counter- and Cross-Claims. Their new counsel adopted the previously filed motion to dismiss, however, which asserted that Bartis' defamation claim must be dismissed because the State Court Defendants' speech was absolutely privileged. (Doc. Nos. 18-3, 18-9). The motion stated in relevant part as follows:

> In this Action, Plaintiff (Bartis) alleges that police officers for the Bridgeton Police Department (the "Department") reported to their superiors that Plaintiff may have used excessive force against detainees, which accusations led to internal affairs and FBI investigations that are on-going. Plaintiff claims the accusations were false and has sued the officers, ranking officials in the Department and the Department itself for....defamation....
>
> Among other reasons set forth herein, Plaintiff's claims must be dismissed because:...2) the officers' reports of police misconduct by Plaintiff are absolutely privileged;....
>
> Reports by police officers to their superiors and to the FBI of unlawful conduct by a fellow police officer, which reports resulted in an on going internal affairs investigation and an FBI investigation, are entitled to absolute privilege....
>
> Rule 6.04 of the police department's rules and regulations requires police officers to "report any criminal conduct or violation of any rule, regulation, or order by other members." *See* Rule 6.04(J), Ex. A. Rule 6.03(u) of the police department's rules and regulations prohibits the use of excessive force. *See* Rule 6.03(u), Ex. A. Here, pursuant to their duty to the public and pursuant to the police department's rules and regulations, the Defendant officers reported what they suspected was unlawful conduct in the form of excessive force against detainees to their superiors, which reports led to an internal affairs and FBI investigation. ... If police officers who are sworn "To Protect and Serve" and required to report criminal conduct by fellow officers are subject to defend against lawsuits for making those required reports, those officers will be discouraged from reporting other police misconduct at all. Consequently, the administration of justice will suffer....
>
> In the instant case, Plaintiff bases his defamation claim against the Department and fellow officers on allegedly false reports by those officers to their superiors and the FBI. The officers' statements, however, initiated and/or were made in connection with both an internal affairs investigation and FBI investigation of Plaintiff's potentially criminal conduct. As such, these reports, which Defendants had a duty to make and/or investigate, are protected by an absolute privilege. As such, Defendants are absolutely immune from civil action regardless of intent. Accordingly, Plaintiff's defamation claim must be dismissed.

(Doc. No. 18-3, PP. 1-2, 8-10).

As stated above, Bartis maintains the above assertions constitute judicial admissions, sufficient to bar Counter-Plaintiffs' current position regarding whether they spoke in their capacities as private

citizens. Under Eighth Circuit law, "[s]tatements contained in a party's pleadings are binding on that party, and are considered judicial admissions, unless the statements are withdrawn or amended." In re Crawford, 274 B.R. 798, 804-05 (8th Cir. BAP 2002) (citations omitted). This Court has elaborated on the doctrine of judicial admissions as follows:

> It is elementary that the doctrine of judicial admissions (when otherwise warranted) pertains only to matters of *fact* which otherwise would require *evidentiary* proof. As held in *State Farm Mutual Auto Ins. Co. v. Worthington*, 8 Cir. 1968, 405 F.2d 683, "The purpose of a judicial admission is that it acts as a *substitute for evidence* in that it does away with the need for *evidence* in regard to the subject matter of the judicial admission."
>
> Moreover, as Judge Haynsworth well stated in *New Amsterdam Casualty Company v. Waller*, 4 Cir. 1963, 323 F.2d 20, 24-25: "The doctrine of judicial admissions has never been applied to counsel's statement of his conception of the *legal theory* of the case. When counsel speaks of legal principles, as he conceives them and which he thinks applicable, he makes no judicial admission and he sets up no estoppel which would prevent the court from applying to the facts disclosed by the proof the proper legal principles as the Court understands them."

Clark v. Mobil Oil Corp., 1980 WL 2002 at *3 (E.D. Mo. Sept. 5, 1980) (emphasis in original). See also Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC, 477 F.3d 383, 394 (6th Cir. 2007) (internal quotations and citation omitted) ("[W]e reiterated that we are reluctant to treat [statements dealing with opinions and legal conclusions] as binding judicial admissions."); U.S., ex rel. Miller v. Bill Harbert Intern. Const., Inc., 2007 WL 851871 at *1 (D.D.C. Mar. 14, 2007) (same).

Upon consideration, the Court finds the assertions contained in Counter-Plaintiffs' State Court Motion to Dismiss dealt with legal conclusions, and not matters of fact, and thus cannot constitute binding judicial admissions. See Roger Miller, 477 F.3d at 394. Specifically, the Court notes Counter-Plaintiffs' earlier arguments addressed their former attorney's interpretation of both Police Department regulations and the law, on such issues as whether Counter-Plaintiffs had a duty to report Bartis' alleged misconduct to their superiors and/or the FBI, and whether their reporting was

privileged. These matters do not concern unequivocal statements regarding matters of fact, subject to the production of evidentiary proof at trial. Id. Bartis' Motion for Summary Judgment on the basis that Counter-Plaintiffs are barred by judicial admissions from claiming they spoke as private citizens must therefore be denied.[9]

### 2. Were Counter-Plaintiffs Speaking As Private Citizens Or Public Employees When They Reported Bartis' Alleged Misconduct?

As stated above, in Count II of their Counterclaim, Counter-Plaintiffs claim Bartis retaliated against them for exercising their First Amendment rights, in violation of 42 U.S.C. § 1983. (Counterclaim, ¶¶ 39-47). In his Motion for Summary Judgment, Bartis asserts Counter-Plaintiffs' § 1983 claim fails, because their speech was not protected by the First Amendment. Thus, this Court must determine whether Counter-Plaintiffs' speech was made pursuant to their official duties. See Morales v. Jones, 494 F.3d 590, 596 (7th Cir. 2007), cert. denied, 2008 WL 59371 (2008).

"Because both parties in *Garcetti* agreed that Ceballos' speech was made pursuant to his official duties, the [Supreme] Court 'had no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate.'" Morales, 494 F.3d at 596, quoting Garcetti, 126 S.Ct. at 1961. Lower courts attempting to apply Garcetti have followed the Supreme Court's general guidance that, "the proper inquiry is a practical one," and should focus on, "the duties an employee actually is expected to perform." Garcetti, 126 S.Ct. at 1961, 1962.

#### a. Counter-Plaintiffs' Statements To Their Superiors

---

[9] In any event, the Court notes that even if Counter-Plaintiffs' statements were held to be judicial admissions, "it is also well-established that trial judges are given broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases." Electric Mobility Corp. v. Bourns Sensors/Controls, Inc., 87 F.Supp.2d 394, 406 (D.N.J. 2000) (citations omitted).

In June and July, 2004, Counter-Plaintiffs provided their command staff with written statements regarding Bartis' excessive use of force with prisoners. (Counterclaim, ¶¶ 7-11). At that time, the City of Bridgeton initiated an internal affairs investigation of Bartis, and assigned the investigation to Hood and Wacker. (Id., ¶ 10).

Upon consideration of the record, the Court finds Counter-Plaintiffs were not speaking as private citizens for First Amendment purposes when they made their statements to their superiors, for several reasons. See Garcetti, 126 S.Ct. at 1960. First, the Court notes that Rule 6.04(J) of the Police Department's rules and regulations requires police officers to, "report any criminal conduct or any violation of any rule, regulation, or order by other members." (Police Department Rule 6, Doc. No. 67-12, P. 6). Thus, Livingston's and O'Connor's initial reports regarding Bartis' alleged misconduct were required pursuant to Police Department policy. Further, each Counter-Plaintiff has admitted his written report was submitted pursuant to orders from his superiors. See, e.g., Livingston Dep., Doc. No. 70-5, PP. 73, 96-97, 101-02; Livingston Statement, Doc. No. 70-8; Drews Dep., Doc. No. 70-9, PP. 58-61; Drews' Statement, Doc. No. 70-13; Pulling Dep., Doc. No. 70-14, PP. 41-43; Doc. No. 70-15, PP. 125, 152-54; O'Connor Dep., Doc. No. 70-16, PP. 101-03, 116; Doc. No. 70-17, P. 117; Rowe Dep., Doc. No. 70-18, PP. 92, 105-06. Thus, as police officers, Counter-Plaintiffs had duties both to report instances of officer misconduct, and to cooperate with the investigation Hood and Wacker were conducting into Bartis' alleged actions. See Bradley, 479 F.3d at 538. See also Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006), cert. denied, 127 S.Ct. 1918 (2007) (internal reports of prisoner and prison officials' misconduct were submitted pursuant to plaintiff's official duties as a correctional officer, and thus were not constitutionally protected); Battle v. Board of Regents for Georgia, 468 F.3d 755, 761 (11th Cir. 2006). The Court thus holds the

statements Counter-Plaintiffs provided to their superiors within the Police Department were made pursuant to their official duties, and thus are not entitled to protection under the First Amendment.

### b. Statements To The FBI

In his Motion for Summary Judgment, Bartis further asserts Counter-Plaintiffs' statements to the FBI similarly are not protected by the First Amendment, because they too were made pursuant to Counter-Plaintiffs' official duties as police officers. With respect to Livingston and O'Connor, the Court finds a genuine issue of material fact remains on this issue. Specifically, the Court notes that the Police Department's regulations did not require Livingston and O'Connor to report Bartis' alleged misconduct to the FBI; rather, the Department's written policy actually prohibited officers from, "mak[ing] known to any person not a member of the Police Department any information whatsoever concerning matters learned by them in the course of their duty as members of the Department or obtained by them by virtue of their connection with the Department, without the express permission of the Chief of Police;...." (Police Department Rule 6.03(d), Doc. No. 67-12, P. 4). Further, O'Connor testified that as a practical matter, his job duties did not involve reporting other officers' alleged acts of misconduct to outside agencies; rather, O'Connor claims no other officer had done so during his twenty-two years with the Department. (O'Connor Dep., Doc. No. 75-8, P. 3). In light of these assertions, the Court finds a genuine issue of material fact remains with respect to whether Counter-Plaintiffs Livingston and O'Connor were acting as private citizens, rather than public employees, when they made their complaints to the FBI. See, e.g., Batt v. City of Oakland, 2006 WL 1980401 at *4 (N.D. Cal. Jul. 13, 2006) ("Here, defendants' argument that plaintiff had a duty to report misconduct rests on [Oakland Police Department] rules and regulations-materials which the *Garcetti* Court suggested are not dispositive. The central premise of plaintiff's case is that not withstanding any official policy of the OPD, the culture of the OPD and the express

commands of his direct supervisors established that plaintiff had a duty *not* to report misconduct....Thus, a fact issue remains as to whether plaintiff's speech was protected under the First Amendment."); see also Freitag, 468 F.3d at 545 (correctional officer acted as a citizen when she wrote letters to a Senator and communicated with the Inspector General regarding her complaints of sexual harassment at the prison).

With respect to Counter-Plaintiffs Pulling, Rowe, and Drews, however, the Court finds their statements to the FBI were made pursuant to their official duties as police officers. The Court's review of the record reveals that on February 23, 2005, Major Steinman issued a memorandum, stating in relevant part as follows[10]:

> We have learned of an investigation of this Department involving the FBI. We have also learned that the FBI may contact and seek to interview all Department personnel in the course of this investigation.
>
> The City of Bridgeton and the Bridgeton Police Department are committed to cooperating in all aspects of this investigation....
>
> As such, any Department personnel who are contacted in connection with the investigation should politely advise the investigators that the Department is represented by counsel and that counsel will work with investigators to arrange times to interview Department personnel.
>
> Any Department personnel who are contacted must then notify their commander of the contact in order that arrangements may be made to cooperate with investigators.

(Memorandum, Doc. No. 70-22). Counter-Plaintiffs Pulling, Rowe, and Drews all met with FBI personnel in April, 2005, after Major Steinman issued his memorandum directing their cooperation with the agency. Furthermore, Counter-Plaintiff Pulling testified at his deposition that he was paid overtime by the Police Department for his interview with the FBI, and that he requested the overtime pay because he felt the interview with the FBI was, "department related," as it stemmed from an

---

[10] The memorandum was read to officers during roll call.

- 14 -

internal investigation. (Pulling Dep., Doc. No. 70-15, PP. 156-159, 163). Counter-Plaintiff Rowe acknowledged that he was paid by the City while he researched for his interview with the FBI. (Rowe Dep., Doc. No. 70-18, PP. 96-99). Finally, Counter-Plaintiff Drews testified that Major Steinman directed him to cooperate with the FBI, and to coordinate the timing of his interview with his supervisor. (Drews Dep., Doc. No. 70-11, PP. 136-138).[11] In light of these admissions, the Court finds Counter-Plaintiffs Pulling, Rowe, and Drews conducted their interviews with the FBI pursuant to their official duties as police officers, and thus the statements they gave are not entitled to protection under the First Amendment. See Garcetti, 126 S.Ct. at 1960. Count II of Counter-Plaintiffs' Counterclaim as it relates to these three officers will therefore be dismissed.

### B. Is Bartis Liable For The Alleged Retaliation Livingston And O'Connor Suffered At The Hands Of His Subordinates Officers?[12]

Under Eighth Circuit law, it is well settled that the doctrine of respondeat superior is inapplicable to § 1983 claims. Vaughn v. Greene County, Ark., 438 F.3d 845, 851 (8th Cir. 2006). Rather, "supervisors in this position are liable under § 1983 for a subordinate's violation of a third person's constitutional right only if their deliberate indifference to the offensive conduct and failure to take adequate remedial action proximately caused the injury." Cox v. Sugg, 484 F.3d 1062, 1066 (8th Cir. 2007) (citations omitted).

In their Counterclaim, Livingston and O'Connor assert Bartis oversaw and supervised the actions and conduct of those officers making the comments and taking the retaliatory actions against

---

[11] Drews even requested to attend his deposition in connection with the instant case on duty time, as, "this is an issue which arose from a Departmental Investigation which I had been ordered to participate in,..." (Drews' September 5, 2007, Interoffice Memorandum to Chief Mutert, Doc. No. 70-24).

[12] Bartis obviously may be held liable for any acts of retaliation he personally committed, and the Court finds a genuine issue of material fact remains with respect to whether Bartis' acts constituted adverse employment actions in the first instance.

them. (Counterclaim, ¶ 18). Livingston and O'Connor further allege Bartis encouraged and promoted the harassment against them. (Counter-Plaintiffs' Opp., P. 12). Upon consideration of the foregoing, the Court finds a genuine issue of material fact remains with respect to whether Bartis may be held liable for the allegedly retaliatory actions of his subordinate officers. Bartis' Motion for Summary Judgment on this point will therefore be denied.[13]

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Bartis' Motion for Summary Judgment (Doc. No. 72) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.

**IT IS FURTHER ORDERED** that Count III of Counter-Plaintiffs' Counterclaim is **DISMISSED** with prejudice.

**IT IS FURTHER ORDERED** that Brian Pulling, Dale Rowe, and Carl Drews are **DISMISSED** as Counter-Plaintiffs in this matter.

**IT IS FURTHER ORDERED** that Jim Livingston is **DISMISSED** as a Counter-Plaintiff in Count I of this matter.

Dated this 18th day of January, 2008.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE

---

[13] The Court reiterates Bartis may only be held liable for acts of retaliation occurring after Livingston and O'Connor reported Bartis' misconduct to the FBI. Thus, Bartis may not be held liable under § 1983 for his alleged assault on O'Connor, as that incident admittedly took place before O'Connor approached the FBI.